IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


JENITA CLANCY,

                    Plaintiff,

vs.                                    Case No. 18-4106-SAC-JPO

MARK T. ESPER, Acting
Secretary of Defense,

                    Defendant.

**MEMORANDUM AND ORDER**

    This case is before the court upon defendant's motion for
summary judgment.  Plaintiff has brought an action alleging
employment and post-employment discrimination in violation of the
Rehabilitation Act.

## I. Pro se standards

    Plaintiff is proceeding pro se.  "A pro se litigant's
pleadings are to be construed liberally and held to a less
stringent standard than formal pleadings drafted by lawyers." Hall
v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991).  A pro se
litigant, however, is not relieved from following the same rules
of procedure as any other litigant. See Green v. Dorrell, 969 F.2d
915, 917 (10th Cir. 1992).

## II. Summary judgment standards

    Summary judgment is appropriate if the pleadings, the
discovery and disclosure materials on file, and any affidavits

1

show "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter if law." Fed.R.Civ.P. 56(a). "Unsupported conclusory allegations do not create a genuine issue of fact." L & M Enters., Inc. v. BEI Sensors & Sys. Co., 231 F.3d 1284, 1287 (10th Cir. 2000).

An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998). Credibility determinations may not influence the court's decision. Fogarty v. Gallegos, 523 F.3d 1147, 1165-66 (10th Cir. 2008). Disputed facts are resolved in favor of the nonmovant. McCoy v. Meyers, 887 F.3d 1034, 1044 (10th Cir. 2018).

Defendant, as the movant for summary judgment, has the initial burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This may be done "by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." Adler, 144 F.3d at 671. If this burden is met, the burden then shifts to plaintiff to demonstrate that genuine issues of material fact remain for trial as to those matters for which plaintiff has the burden of proof. See McCoy, 887 F.3d at 1044.

III. Plaintiff's legal claims

According to the pretrial order, "plaintiff asserts that she is entitled to recover upon the theory that she was subjected to

and suffered disability discrimination and a hostile work environment/harassment based on psychiatric disability (specifically, PTSD, depression, and anxiety), in violation of the Rehabilitation Act." Doc. No. 112, p. 17. Although plaintiff has mentioned "retaliation" a few times in her response to the motion for summary judgment, retaliation against activity protected by the Rehabilitation Act is not listed as a claim in the pretrial order or supported by facts evident in the record.[1]

IV. <u>The Rehabilitation Act</u>

Section 501 of the Rehabilitation Act is the exclusive remedy for plaintiff's claim of disability discrimination. <u>Johnson v. United States Postal Serv.</u>, 861 F.2d 1475, 1477 (10th Cir. 1988). The Rehabilitation Act is interpreted as incorporating the standards of the Americans with Disabilities Act (ADA). <u>Wilkerson v. Shinseki</u>, 606 F.3d 1256, 1262 (10th Cir. 2010). To establish a prima facie case of discrimination, plaintiff must prove that: 1) at the time of the alleged discrimination, she had a disability within the meaning of the Rehabilitation Act; 2) she was qualified for her job; and 3) she suffered an adverse employment action because of the disability. See <u>id.</u>; <u>Woodman v. Runyon</u>, 132 F.3d 1330, 1338 (10th Cir. 1997). The definition of disability under the Rehabilitation Act is "a physical or mental impairment that

---

[1] As noted in the pretrial order, the court in previous orders has denied plaintiff's attempt to amend her claims to assert retaliation in violation of Title VII.

constitutes or results in a substantial impediment to employment."
29 U.S.C. § 705(9). The Rehabilitation Act also incorporates the
definition of "disability" under the ADA, 42 U.S.C. § 12101(1):
"(A) a physical or mental impairment that substantially limits one
or more major life activities of such individual; (B) a record of
such an impairment or (C) being regarded as having such an
impairment." <u>Bent-Crumbley v. Brennan</u>, 2020 WL 360437 *3 (6th Cir.
2020).

V. <u>Facts</u>

Although, contrary to Fed.R.Civ.P. 56(c)(1) and D.Kan.R.
56.1(a)&(b), plaintiff's opposition to the summary judgment motion
mostly fails to include usable references to the record, the court
has not applied a stringent standard in construing plaintiff's
response. Fed.R.Civ.P. 56(c)(3) permits the court to consider
uncited materials in the record and the court has done so. With
that in mind, the court accepts the following facts as true solely
for the purposes of the summary judgment motion.

Plaintiff was employed at the commissary store at Fort Riley,
Kansas from November 15, 2015 to November 3, 2016, when plaintiff
resigned. The store is part of a chain of commissaries providing
groceries to military personnel and others. The chain is operated
by the Defense Commissary Agency (DeCA). Before the job at Fort
Riley, plaintiff worked at Fort Leonard Wood in Missouri for DeCA.

4

At Fort Riley, plaintiff worked as a secretary in an office which had five other administrative employees. Plaintiff's first, second and third-level supervisors were, respectively, Tina Groves (Assistant Commissary Officer), William Rasco (the Commissary Officer), and Jerome Katrenick (Zone Manager). Katrenick was not located at Fort Riley. Rasco started at the Fort Riley Commissary on March 20, 2016, a few months after plaintiff started.

Plaintiff's job description included secretarial and administrative duties, personnel and payroll liaison duties, supply related duties, and other duties as assigned. It was acceptable to assign the store secretary to address needs as required. It was a "very demanding job" according to Mr. Rasco.

Plaintiff has PTSD, depression and anxiety. She claims that she told Groves and Rasco of these conditions in March 2016 and other dates. Plaintiff's doctor, Dr. Richard Mulrenin stated on December 29, 2017, more than a year after plaintiff resigned, that:

> I have been seeing Ms. Clancy for psychotherapy periodically since August 2013. She is diagnosed with Major Depressive Disorder and Posttraumatic Stress Disorder. She experiences several distressing symptoms including depressed moods, acute anxiety, occasional suicidal ideation and a marked difficulty concentrating. Some of her symptoms have been exacerbated by financial stressors over the past year. On numerous occasions in the past year, she has reported struggling to muster enough concentration to read and understand forms and other documents.

On October 7, 2015, about a month before plaintiff started at Fort Riley, Dr. Mulrenin's progress notes stated:

> While Ms. Clancy reports occasional symptoms associated
> with PTSD, her symptoms have decreased in severity.
> Given that she just met minimal symptoms for the
> diagnosis previously, and these symptoms do not cause
> significant distress or dysfunction, the diagnosis of
> PTSD will be removed at present.

The progress notes from October 7, 2015 also state that plaintiff did not meet the criteria for major depression at that time.

Plaintiff never requested an accommodation for her conditions.

On March 20, 2016, Rasco's first day at the Fort Riley commissary, plaintiff was directed by Groves to work even though it was a Sunday and not a normal working day for plaintiff. Plaintiff took a day off during the week to accommodate the schedule change, but she did not receive Sunday premium pay for working on a Sunday. Plaintiff stated in her deposition that she did not complain about it and is not complaining now. Doc. No. 125-5, p. 15 (page 89 of plaintiff's deposition).

On May 14, 2016, Groves sent plaintiff an email indicating that plaintiff had not timely submitted a report and that it could risk employees' timely pay and leave. The email stated that:

> [g]oing forward failing to follow my instructions will
> result in progressive action. Please have both time
> sheets turned into me on Tuesday morning. Thank you.

Plaintiff replied with an email stating that she was unable to do the work because Groves' had assigned her other duties on "the Floor." Plaintiff continued: "I can't do my work if you keep

calling me in our office and you keep giving me other extra work,
I was [o]n the floor most [of] my Friday . . ."

Plaintiff admits that she received repeated poor reviews from
Groves in the summer and fall of 2016. Plaintiff's first formal
performance counseling meeting occurred on July 25, 2016.
Plaintiff received a rating of "fully successful" for the period
ending June 20, 2016. Plaintiff also received a performance plan
for the period July 1, 2016 to June 30, 2017 and a letter regarding
performance issues.[2] The letter, signed by Groves, identified 12
performance problems which Groves said she had addressed "multiple
times and they have not been corrected."

The twelve issues were:

On or about March 31, 2016, you missed a Headquarters
suspense on the submission of internal surveys.

On or about April 3, 2016, you failed to submit new hire
documents to me.

On or about April 5, 2016, you submitted incorrect 35-1
forms that had to be redone.

On or about May 25, 2016, you improperly contacted the
Headquarters Lead Consumer Safety Officer, on behalf of
the Commissary CAOs, to request that his emails include
UPCs. The email submitted already included UPCs, but
regardless, it was improper for you to make this request
without discussing with management.

On or about May 27, 2016, you identified that you were
unable to complete your duties. You acknowledged that
you were delayed one (1) month in organizing and
completing time and attendance, delayed in creating four

[2] The performance plan was not a formal performance improvement plan (PIP) which
is part of the administrative process at DeCA to improve deficient work
performance.

(4) requests for personnel action (RPA), delayed in processing documents for six (6) new employees, and delayed in entering the customer distribution list.

On or about June 2, 106, (sic) you improperly submitted leave documents to Headquarters for Casey Roseann.

On or about June 7, 2016, you tried to log access the contracting website after you bad (sic) been trained and notified that you did not have access.

On or about June 8, 2016, you improperly reported that we had two (2) vacancies, when we actually had 20 vacancies, as you did not understand the Unit Manning Document (UMD).

On or about June 13, 2016, you identified that you were unsure about documenting notes of the staff meeting for the week.

On or about June 16, 2016, you submitted an incomplete resume for a new employee's background investigation.

On or about June 17, 2016, outdated information was found on the Commissary web page. You had been notified on or about May 27, 2016 to update the web page.

On or about June 21, 2016, you missed a suspense to the Zone Manager to report our vacancies.

The letter further stated:

I am hopeful that improvement of your performance will occur and that no further action will be necessary. If you have any questions on your performance standards, the information in this letter, or if you do not fully understand my expectations of you, please ask me for clarification. In order for you to perform satisfactorily, you must note and correct the . . . listed areas of concern. Future issues could result in the initiation of other administrative actions.

As I have discussed with you previously, if you are interested in a reassignment or change to lower grade to a position better suited to your needs, please notify me.

I do understand that from time to time there may be
tensions outside of the work environment that might
impact on the job conduct and performance. If you are
experiencing personal concerns, you may find the
services offered through the Employee Assistance Program
(EAP) may be beneficial . . . .

These issues were discussed with plaintiff, who became
defensive and concerned that she was going to be terminated.
Plaintiff was not terminated, nor was she placed on a formal
Performance Improvement Plan (PIP).

Plaintiff responded to the performance review with a letter
to Rasco dated August 8, 2016 which stated in part:

I am disappointed that you have found my performance
below your expectations in some areas.

It's very important to me to keep working on our team
and I am planning to do my very best to improve my
performance.

I would like to clarify and make sure I understand some
performance issues brought up on Memorandum written by
Mrs. Tina Groves.

The letter ended by requesting documents from Groves about
different job issues. The letter did not complain of
discrimination.

Plaintiff has asserted (although she's not "too positive")
that Groves asked plaintiff three or four times to step down to a
cashier's position and told plaintiff that the secretary position
was stressing plaintiff out and not good for her mental health.
Doc. No. 125-5, p. 26 (p. 104 of plaintiff's deposition).
Plaintiff was never demoted.

9

In October 2016, Groves gave plaintiff a formal progress review on her performance plan, which identified a series of areas where improvement was still needed.[3] The progress review stated in part:

> Jenita I need you to improve on being timely in meeting the needs of both external and internal customers. Take more of an initiative to be more resourceful in finding the solutions to improve customer relations in order to contribute towards sales growth and promote the agency in a positive image . . . I need to see the sense of urgency it takes when filling request[s] from internal and external customers. You need to meet your suspenses or deadlines ahead of time and not wait until the last minute to complete. Jenita you need to take ownership of your actions including mistakes or errors . . .I need you to be meeting all suspenses and deadlines by properly maintaining calendar items and suspense items as you have missed several suspenses. Your organizational skills need to improve for you to become more efficient in your everyday duties as you misplace or lose emails or sometime[s] just forget. More improvement is need[ed] when receiving and reviewing all incoming/outgoing correspondence and reports . . . In reviewing [Liaison Duties] I see you need [to] take more of an independent stance on processing request[s] for personnel action in a more timely manner. Please ensure you are verifying the time and attendance records to ensure all documentation is attached to the T&A, such as Leave Request, OT Request, Certification sheet and/or Tale Amendments . . . Always be mindful of safety and security and slowdown in the office as [at] times I see you running from your cubicle to my office or Mr. Rasco's office . . . I know you[] are learning [Ordering and Accountability] and are beginning to take on more accounts, but be mindful of all the documentation you must maintain such [as] invoices, accounts, receipts, vouchers, logs, or journals. . .

---

[3] According to plaintiff's response to the summary judgment motion, this was preceded by two write-ups on September 28 and September 30, 2016. Doc. No. 130, p. 54.

Plaintiff was resistant to Groves' monthly counseling meetings and it appeared to Groves that plaintiff did not want to hear what she was doing wrong or take ownership of her mistakes.

On November 3, 2016, Groves and Rasco met with plaintiff in Rasco's office. Defendant contends that during the meeting, plaintiff's performance problems were discussed and plaintiff was informed that she was to be placed on an official PIP. Plaintiff contends that a PIP was never a topic and that the only topic was a news release that plaintiff had discussed with Mr. Katrenick. Plaintiff claims that Groves was not happy and threatened her with insubordination. Plaintiff further asserts that Rasco became angry, raised his voice, threatened and reprimanded plaintiff. Plaintiff became upset or distressed and left the office. When she was told to return, she said, "Just fire me then," or words to that effect. Witnesses heard plaintiff say that she quit. Plaintiff denies that she said she quit. Groves told plaintiff that if plaintiff was resigning she needed to complete a Form SF-52 Request for Personnel Action. Plaintiff became sick and vomited. Later, although she did not complete the form, she wrote a resignation letter which stated:

> I am tendering my resignation effective today November
> 3, 2016. Thank you for all the support working with you
> was a great opportunity.

Plaintiff has stated in her deposition that she was not forced or directed to write the resignation letter, but that she did so

because Groves was asking plaintiff to complete a SF-52 form. Doc. No. 125-5, pp.49-50 (pages 166-67 of plaintiff's deposition). After writing the letter, plaintiff told other people in the office that she was quitting. Rasco wrote a recommendation letter for plaintiff after plaintiff's resignation because he felt she had good qualities and would be an asset if hired in a customer service situation.

On November 7, 2016, plaintiff requested to withdraw her resignation. This was denied, but plaintiff was told she could apply for any of the positions currently available at the store. A secretary was hired to replace plaintiff. Groves knew when the replacement was hired that she had a disability. The current secretary is often assigned tasks on the sales floor.

Plaintiff filed an application for unemployment benefits with the Kansas Department of Labor (KDOL) after she resigned. The application was denied. Rasco and Groves were not contacted by the KDOL and did not provide any information to KDOL about plaintiff. Plaintiff claims that KDOL was told that plaintiff left her job over a disagreement regarding the employer's evaluation of her job performance and that plaintiff felt that she could not work for her supervisors because they treated her badly.

After resigning, plaintiff wrote a very complimentary letter regarding Rasco, but she stated: "What I learned from Tina Groves was anxiety and depression because she is always intimidating me."

VI. Plaintiff cannot establish that while employed by defendant she had a "disability" for the purposes of the Rehabilitation Act.

As already noted, to enjoy protection under the Rehabilitation Act, plaintiff must be an "individual with a disability," that is: 1) have a physical or mental impairment that substantially limits one or more of her major life activities; 2) have a record of such impairment, or 3) be regarded as having such an impairment. Defendant argues that to establish that plaintiff had a disability at the relevant time of this case, plaintiff must present expert testimony. Plaintiff, however, has stated for the record (see Doc. No. 66) that she will not present expert testimony. Plaintiff also has not disputed in response to the summary judgment motion that she will not present expert testimony.

The court believes that expert testimony would be necessary for a layperson to decide whether plaintiff's alleged PTSD, depression and anxiety at the time of her employment substantially limited her in one or more of her major life activities. These conditions, although part of common parlance, are not so well understood and obvious to a common person that he or she could plausibly reach a credible determination as to the nature and extent of plaintiff's disability without the testimony of an expert. Cf., Russell v. Phillips 66 Co., 687 Fed.Appx. 748, 753-56 (10th Cir. 2017)(dismissing relevance of lay affidavits

regarding the limitations resulting from depression); <u>O'Neal v.</u>
<u>Centene Management Co., LLC</u>, 2018 WL 4637270 *15 (D.Kan.
9/27/2018)(absence of medical evidence that generalized anxiety
disorder or GERD significantly limited a major life activity
prevented plaintiff from proving an actual impairment).

The record before to the court indicates that at trial
plaintiff could not present admissible expert evidence that her
impairments substantially limited one or more of her major life
activities at the time of her employment. Further, the nonmedical
evidence in the record fails to demonstrate that expert testimony
is unnecessary to establish that plaintiff had a disability for
the purposes of the Rehabilitation Act. Plaintiff has argued
that she told Groves and Rasco of her mental conditions and that
she had a disability listing in her employment file. Assuming
this is true, it is not sufficient to prove to a reasonable jury
that plaintiff had a record of a mental impairment that
substantially limits one or more of her major life activities or
that she was regarded as having such an impairment.

Because there is an absence of proof that plaintiff, while
working at Fort Riley, was an individual with a disability as
defined by the Rehabilitation Act, defendant is entitled to summary
judgment.

VII. <u>Plaintiff cannot demonstrate an adverse employment action.</u>

Plaintiff's discrimination claim requires proof of an adverse employment action. See <u>EEOC v. C.R. England, Inc.</u>, 644 F.3d 1028, 1040 (10th Cir. 2011). An adverse employment action requires conduct resulting in a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." <u>Id.</u> The adverse action must cause more than a de minimis harm or impact. <u>Id.</u>

Plaintiff has broadly argued that her immediate supervisor made her work life miserable because of some unfair criticism or blame, excessive oversight, an unreasonable work assignment, unspecified threats or warnings, and closed-door meetings.[4] But, unless such conduct amounts to a hostile work environment or a constructive discharge, these allegations, even if true, do not create a material issue of fact as to an adverse employment action. See <u>Barton v. Zimmer, Inc.</u>, 662 F.3d 448, 453-54 (7th Cir. 2011)(listing three categories of adverse employment actions: 1) termination or reduction in financial terms of employment; 2) transfers or changes in job duties that cause skills to atrophy

---

[4] Plaintiff also alleges that she did not receive Sunday premium pay when she worked one Sunday to assist Rasco's orientation on his first day on the job and that one other time she may not have been properly compensated for training time at a military base in Nebraska. There is no evidence that either event was a "significant change" in her pay or compensation or that she lost this compensation or benefit because of discrimination.

and reduce future career prospects; and 3) unbearable changes in job conditions such as hostile work environment or conditions amounting to constructive discharge).

"A hostile work environment is a workplace 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." Dye v. Moniz, 672 Fed.Appx. 836, 840 (10th Cir. 2016)(quoting Herrera v. Lufkin Indus., Inc., 474 F.3d 675, 680 (10th Cir. 2007)). A court may look at the frequency of the alleged discriminatory conduct, its severity, whether it is physically threatening or humiliating or merely an offensive utterance and whether it unreasonably interferes with an employee's work performance. Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

Here, plaintiff does not allege physically threatening or humiliating conduct. Plaintiff was apparently offended by questions or comments regarding job stress and EAP resources. These remarks were not in the realm of ridicule or excessively abusive or demeaning. Nor did they permeate the workplace environment. Plaintiff seems most upset about criticism of her job performance, the frequent monitoring by Groves and closed-door meetings with Groves. The Tenth Circuit affirmed the rejection on summary judgment of a somewhat similar hostile work environment claim in Trujillo v. University of Colorado Health Sciences Center,

157 F.3d 1211, 1214 (10th Cir. 1998). In Trujillo, the plaintiff complained of a supervisor who documented problems in his job performance, criticized and checked on his work, and placed a corrective action in his personnel file that warned him he needed to improve his attendance. The Tenth Circuit affirmed summary judgment against the plaintiff's claim stating:

> The hostile work environment that Plaintiff portrays is simply a work environment that exhibits the monitoring and job stress typical of life in the real world. Normal job stress does not constitute a hostile or abusive work environment. As the Seventh Circuit explained, federal law "does not guarantee a utopian workplace, or even a pleasant one.... [P]ersonality conflicts between employees are not the business of the federal courts." Vore [v. Indiana Bell Tel. Co.,, 32 F.3d 1161, 1162 7th Cir. 1994)]. We cannot vilify every supervisor that implements a policy with which an employee disagrees or that monitors her employees' conduct. Plaintiff has not cited any cases that have found similar employer conduct to constitute a racially hostile work environment, and we decline to extend the contours of a "hostile work environment" to include Plaintiff's alleged job situation.

157 F.3d at 1214.

Similarly, in Dye, 678 Fed.Appx. at 840, the court stated that the plaintiff's complaints of a negative job evaluation, unsatisfying work assignments, and a threatened negative performance evaluation were not sufficient to support a claim of altered conditions of employment. See also, Williams v. FedEx Corporate Services, 849 F.3d 889, 897 (10th Cir. 2017)(evidence that the plaintiff struggled under a heavy workload, received no relief when he asked for help and experienced sarcasm and name-

calling by and disciplinary action from his supervisors, does not suffice to show hostile work environment); <u>Lujan v. Johanns</u>, 181 Fed.Appx. 735, 738 (10th Cir. 2006)(restrictive leave policy, PIP, and letters of warning did not create a hostile work environment); <u>Winn v. K.C. Rehabilitation Hosp., Inc.</u>, 2015 WL 6804045 *20-22 (D.Kan. 11/5/2015)(negative job comments and performance evaluations, numerous meetings with management, excessive scrutiny, and one meeting where supervisor yelled, hit his hand on the table, and threatened to fire plaintiff, do not rise to the level of a hostile work environment); <u>DeWalt v. Meredith Corp.</u>, 484 F.Supp.2d 1188, 1198 (D.Kan. 2007)(written and oral reprimands without impact upon responsibilities, pay or benefits do not amount to an adverse employment action).

If plaintiff could establish that she was constructively discharged that would suffice as an adverse employment action. In this instance, plaintiff admits that no one forced her to write her resignation letter, although she said she did so because she was asked to complete a resignation form (which she did not do). The request to complete the resignation form, in turn, was a reaction to plaintiff's statement that she was quitting or words to such effect. This indicates that plaintiff had a free choice of deciding whether or not to resign and that she cannot show she was constructively discharged. See <u>Yearous v. Niobrara Cty. Mem'l Hosp.</u>, 128 F.3d 1351, 1356 (10th Cir. 1997).

A constructive discharge "occurs when an employer unlawfully creates working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign." Strickland v. United Parcel Service, Inc., 555 F.3d 1224, 1228 (10th Cir. 2009)(interior quotation omitted). "The standard is objective: the employer's subjective intent and the employee's subjective views on the situation are irrelevant." Id.

Plaintiff's evidence and allegations indicate that she was unused to receiving criticism of her work performance and that the criticism she received, particularly from Groves, was upsetting. Plaintiff's unhappiness, particularly during the November 3, 2016 meeting, does not establish a constructive discharge claim. Bolden v. PRC Inc., 43 F.3d 545, 552 (10th Cir. 1994). Raised voices on one or two occasions is not sufficient either. Lopez v. Reser's Fine Foods, Inc., 2013 WL 6587933 *3-4 (D.Kan. 12/16/2013). It is also relevant that plaintiff was not at that time on a formal PIP plan and that her job responsibilities, pay, benefits and environment had not changed in an objectively intolerable manner.

The Tenth Circuit's decision in Saville v. IBM, 188 Fed.Appx. 667 (10th Cir. 2006) provides some guidance. There, the plaintiff had received a negative interim evaluation, his complaints about his supervisor were not considered, he was placed on a 30-day performance improvement plan, and he was told he could stay on the plan or retire with a severance package. The plaintiff in Saville

retired, but later alleged that he was constructively discharged. The Tenth Circuit affirmed the grant of summary judgment against the constructive discharge claim. See also, Williams v. Giant Food, Inc., 370 F.3d 423, 434 (4th Cir. 2004)(being yelled at by supervisors, given poor evaluations, and chastised in front of customers is not sufficient to show constructive discharge).

The court concludes that a reasonable jury could not find a constructive discharge on this record. Plaintiff may have resigned because she disliked her supervisors' conduct, but she was not forced to resign because of her supervisors' conduct. On this basis, together with the other findings in this order, the court decides that plaintiff cannot prove an adverse employment action.

The court acknowledges plaintiff's claim that she was wrongfully denied unemployment benefits because defendant inaccurately told KDOL that plaintiff left her job voluntarily for what she considered bad treatment by her supervisors. This claim is not viable for two reasons. First, it does not constitute an adverse employment action. Post-employment opposition to unemployment benefits is not an adverse employment action because it occurs after employment has ceased.[5] See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 64 (2006); Bryant v. Covina-Valley Unified School District, 2018 WL 6016924 *3-4 (C.D.Cal.

---

[5] Opposition to unemployment benefits may constitute retaliation. Plaintiff, however, has neither alleged nor produced any specific evidence showing retaliation against conduct protected by the Rehabilitation Act.

1/10/2018).  Second, as discussed in further detail next in this order, plaintiff cannot prove a discriminatory motive for any opposition to unemployment benefits.

VIII. <u>Plaintiff cannot show that she was discriminated against on the basis of her disability.</u>

To succeed upon a disability discrimination claim, plaintiff must show that any adverse employment action was taken against her because of her disability.  <u>Cummings v. Norton</u>, 393 F.3d 1186, 1189 (10th Cir. 2005).  The court agrees with defendant that plaintiff has presented no direct evidence of such discrimination. Direct evidence of discrimination in this case would be evidence that proves without inference or presumption that adverse employment actions were taken against plaintiff because of her disability.  See <u>Riggs v. AirTran Airways, Inc.</u>, 497 F.3d 1108, 1117 (10th Cir. 2007).  Suggesting that a job is stressing plaintiff or that she might consider a cashier's position or that she might think about EAP resources, is not evidence which proves without inference or presumption that plaintiff was discriminated against because of her disability.  See <u>Dodson v. Flying Dove, Inc.</u>, 2019 WL 1922153 *9 (D.Kan. 4/30/2019) <u>aff'd</u>, 2019 WL 6879149 (10th Cir. 12/17/2019)(statements of personal opinion exhibiting displeasure with pregnancy are not direct evidence of pregnancy discrimination).  In short, there is no direct evidence of disability discrimination in this record.  Accordingly, the court

must move forward with an application of the McDonnell Douglas
burden-shifting framework to determine whether plaintiff can rely
upon indirect evidence to show discrimination. Cummings, 393 F.3d
at 1189.

For the purposes of argument, defendant has assumed that
plaintiff can establish a prima facie case of discrimination.
Under McDonnell Douglas, if defendant is able to posit a valid
reason for an adverse employment action, then the burden is placed
back on plaintiff to show a genuine issue of fact as to whether
the defendant's stated reason was pretextual or unworthy of belief.
See Salguero v. City of Clovis, 366 F.3d 1168, 1175 (10th Cir.
2004). Pretext can be shown:

> by such weaknesses, implausibilities, inconsistencies,
> incoherencies, or contradictions in the employer's
> proffered legitimate reasons for its action that a
> reasonable factfinder could rationally find them
> unworthy of credence and hence infer that the employer
> did not act for the asserted non-discriminatory reasons.
> In determining whether the proffered reason for a
> decision was pretextual, we examine the facts as they
> appear to the person making the decision, not the
> plaintiff's subjective evaluation of the situation.
> Thus, the relevant inquiry is not whether the employer's
> proffered reasons were wise, fair or correct, but
> whether it honestly believed those reasons and acted in
> good faith upon those beliefs.

Lobato v. N.M. Env't Dep't, 733 F.3d 1283, 1289 (10th Cir.
2013)(internal quotation marks, brackets and citations omitted).

Defendant argues that there was a legitimate business reason
to require plaintiff to work on Rasco's first day, which was a

Sunday, because the store secretary was Rasco's "right-hand person" and the "point of contact" for the entire store. Defendant further argues that there were legitimate reasons to require plaintiff to occasionally work on the store floor and that this was within plaintiff's job description. Defendant also contends that the often negative informal and formal performance evaluations, counseling, warnings and instruction were warranted by plaintiff's work problems as documented in writing. Defendant has supported these arguments with evidence in the record.

In response, plaintiff argues that she did not receive negative comments from Groves until after she told Groves that she had a disability in March 2016. Plaintiff asserts that she received positive job reviews at her previous jobs. She also notes that she was rated "fully successful" in the July 2016 evaluation, that she was not placed upon PIP, and that she received a recommendation letter for Rasco. Plaintiff further claims that defendant did not follow DeCA policy in supervising plaintiff's performance. Finally, plaintiff argues repeatedly that Groves and Rasco were motivated to criticize plaintiff because plaintiff had negative information about their performance which she shared or could share with their superiors.

The court finds that plaintiff has failed to create a genuine issue of material fact as to pretext for the following reasons. First, in retaliation cases, temporal proximity is not sufficient

to create a genuine issue of material fact as to whether an adverse action was done in retaliation for protected conduct.  <u>Lounds v. Lincare, Inc.</u>, 812 F.3d 1208, 1236 n.10 (10th Cir. 2015); <u>Annett v. University of Kansas</u>, 371 F.3d 1233, 1240-41 (10th Cir. 2004). The same rule should apply here particularly since plaintiff was relatively new on the job before she says she related to Groves that she had a disability.  One could reasonably expect that a new employee might not be criticized for her job performance as freely as one who has been on the job longer.

Second, this job was different from plaintiff's previous jobs, so her prior job evaluations do not indicate that the criticisms made by Groves and Rasco were motivated by illegal bias. Third, Groves has explained in an affidavit that the "fully successful" rating in the July 2016 evaluation did not mean that plaintiff did not have areas which required improvement.  Plaintiff has not addressed Groves' statement other than to say that Groves and Rasco did not follow DeCA policies.  The DeCA policies to which plaintiff has referred, however, do not prohibit the counseling, monitoring and other steps taken to improve plaintiff's job performance.   The court sees no conflict.   Fourth, the recommendation written by Rasco after plaintiff resigned does not show that the job criticism plaintiff received was disingenuous or motivated by discrimination.  Rasco did not recommend plaintiff for a position similar to that from which she resigned.

Fifth, Rasco's decision not to place plaintiff on PIP before she resigned also does not demonstrate that the criticism of her job performance was illegitimate. The record indicates that placing plaintiff on PIP was a potential next step had she not first resigned. The record does not indicate that placement on PIP is a necessary condition before an employee's job performance may be documented as substandard or may be criticized by a supervisor.

Finally, plaintiff states that if the "truth" be told Groves and Rasco were motivated by plaintiff's statements to their superior or the fear that plaintiff would make other negative statements regarding their performance to a superior. See Doc. No. 130, pp. 21, 36, 41. This indicates that the adverse job actions alleged by plaintiff were not motivated by disability discrimination.

In sum, plaintiff has failed to demonstrate a genuine issue of material fact exists as to whether the nondiscriminatory reasons given for the events which plaintiff contends amounted to a hostile work environment, constructive discharge, or other adverse employment action, are a pretext disability discrimination.

IX. Conclusion

For the above-stated reasons, defendant's motion for summary judgment (Doc. No. 124) shall be granted.

**IT IS SO ORDERED.**

Dated this 10th day of February 2020, at Topeka, Kansas.

s/Sam A. Crow
Sam A. Crow, U.S. District Senior Judge